UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────

IN RE SABINE OIL & GAS CORPORATION,
ET AL.,                                            16-cv-2561 (JGK)
                        DEBTORS,
                                                   OPINION AND ORDER
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, ET AL.,

                  APPELLANTS,

        - against -

SABINE OIL & GAS CORPORATION, ET
AL.,

                  APPELLEES.
───────────────────────────────────

JOHN G. KOELTL, District Judge:

    The Official Committee of Unsecured Creditors ("the

Committee"), the Bank of New York Melon as the Trustee under the

2017 Notes Indenture ("BONY"), and the Wilmington Savings Fund

Society, FSB, and Delaware Trust Company as the Indenture

Trustees for the Forest Notes ("Wilmington"), collectively

referred to as the Appellants, appeal an order entered by the

United States Bankruptcy Court for the Southern District of New

York, Dkt. No. 15-11835, following an evidentiary hearing,

denying the Committee, BONY, and Wilmington derivative standing

to bring actions against various parties, on behalf of Sabine

Oil and Gas Corporation ("SOGC") and related entities (the

1

"Debtors"). The Bankruptcy Court concluded that two of the proposed sets of claims were not colorable claims for relief and that although a third set of proposed claims presented colorable claims, the Debtors had justifiably refused to pursue those claims.

## I.

When reviewing a decision of the Bankruptcy Court, this Court reviews the Bankruptcy Court's conclusions of law de novo but accepts its findings of fact unless they are clearly erroneous. See Fed. R. Bankr. P. 8013; In re Halstead Energy Corp., 367 F.3d 110, 114 (2d Cir. 2004). Mixed questions of law and fact are reviewed de novo, giving deference to the Bankruptcy Court's factual findings unless they are clearly erroneous. In re Vebeliunas, 332 F.3d 85, 90 (2d Cir. 2003); In re Teligent, Inc., 326 B.R. 219, 224 (S.D.N.Y. 2005); see also In re Ames Dep't Stores, Inc., 470 B.R. 280, 283 (S.D.N.Y.), aff'd, 506 F. App'x 70 (2d Cir. 2012).

"Whether a party should be granted derivative standing is a mixed question of law and fact." In re Adelphia Commc'ns Corp., 371 B.R. 660, 665 (S.D.N.Y. 2007), aff'd, 544 F.3d 420 (2d Cir. 2008). A ruling on derivative standing represents an "application of bankruptcy courts' equitable powers," and is reviewed for abuse of discretion. Id. (internal quotation marks and citation omitted).

The Court of Appeals for the Second Circuit has concluded that there is a "qualified right for creditors' committees to initiate suit with the approval of the bankruptcy court." In re STN Enterprises, 779 F.2d 901, 904 (2d Cir. 1985) (citing 11 U.S.C. §§ 1103(c)(5) and 1109(b)); In re Adelphia, 544 F.3d at 424. STN and other forms of derivative standing do not undermine "the debtor's central role in handling the estate's legal affairs or the court's responsibility to monitor for abuses by the parties." In re Adelphia, 544 F.3d at 424.

The STN standing inquiry requires a bankruptcy court to determine whether "the committee presents a colorable claim or claims for relief that on appropriate proof would support a recovery," and "to decide whether the debtor unjustifiably failed to bring suit so as to give the creditors' committee standing to bring an action," by "examin[ing], on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization estate." STN, 779 F.2d at 905.

"The inquiry into whether claims are colorable focuses on whether the claims would survive a defendant's motion to dismiss." In re Copperfield Invs., LLC, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010). Therefore, the Court should not dismiss the claim if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.; see also Ward v. TheLadders.com, Inc., 3 F. Supp. 3d 151, 156 (S.D.N.Y. 2014). The Bankruptcy Court dismissed two sets of claims because they were not colorable. That is an issue of law that is reviewed de novo. Ames Dep't Stores, 470 B.R. at 283.

The second step of the STN inquiry asks whether pursuing colorable claims would likely benefit the debtor's estate. This inquiry requires the "weighing of the probability of success and financial recovery, whether it is preferable to appoint a trustee to bring suit instead of the creditors' committee, and the 'terms relative to attorneys' fees on which suit might be brought.'" In re Am.'s Hobby Ctr., 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998) (quoting STN, 779 F.2d at 905). Accordingly, the issue of whether the Bankruptcy Court properly concluded that certain claims were not in the best interests of the Debtors'

estate is reviewed for abuse of discretion. See Adelphia, 371 B.R. at 665.

## II.

The parties do not dispute the basic facts as set forth in the Bankruptcy Court's opinion. The following facts are taken from the Bankruptcy Court's opinion as well as from the Committee's proposed complaint for constructive fraudulent transfers and related relief filed with its motion for STN standing. See A187.[1]

## A.

This case is about the merger and subsequent financing of two large companies (the "Combination"), Forest Oil Corporation ("Forest" or "Legacy Forest") and Sabine Oil & Gas LLC ("Legacy Sabine" or "Sabine Parent"). Legacy Forest was a publicly traded New York corporation, with headquarters in Denver, Colorado. A17, 75. Legacy Sabine was a Delaware limited liability company, privately held by First Reserve Corporation, a private equity firm. A18, 75. Legacy Sabine was headquartered in Houston, Texas, and its subsidiaries, known as the Legacy Sabine Subsidiaries held the bulk of the enterprise's assets. A18. The

---

[1] Where appropriate, the Court also refers to record designations on appeal as follows: the Appellants' Appendix as "A__"; the Appellees' Appendix as "Appellees' App. A__"; and the Supplemental Designation of Record on Appeal, as "Supp. App. __."

Legacy Sabine Subsidiaries were also Delaware limited liability companies. A75.

The two companies, prior to the Combination, had significant outstanding liabilities. Legacy Forest had approximately $905 million in debt: (1) a reserve-based lending facility with $105 million outstanding, secured by a first priority lien on oil and gas reserves ("Forest RBL") and (2) approximately $800 million in unsecured notes due in 2019 and 2020, at an interest rate of 7.25% and 7.5%, respectively ("Forest Unsecured Notes"). A17. Legacy Sabine had approximately $1.62 billion in debt: (1) a revolving credit agreement with approximately $620 million outstanding ("Legacy Sabine RBL"), (2) $650 million in obligations under the Second Lien Credit Agreement ("Second Lien Loan"), and (3) $350 million in unsecured notes ("Legacy Sabine Notes"). A18. The Legacy Sabine Subsidiaries guaranteed Legacy Sabine's various liabilities.

**B.**

Legacy Forest and Legacy Sabine along with its related entities entered into an Agreement and Plan of Merger on May 5, 2014 (the "May Merger Plan"). According to the May Merger Plan, Legacy Forest would merge with Legacy Sabine, and Legacy Forest would survive as a subsidiary of a newly formed holding company. A19. The Legacy Sabine shareholders would own approximately 73.5% of the holding company while Legacy Forest shareholders

would hold approximately 26.5%. The May Merger Plan would trigger change-of-control provisions in the Legacy Forest Unsecured Notes. This meant that upon closing, the Combined Company would have to make an offer to the holders of the notes to redeem their notes at 101% of the outstanding principal amount plus accrued interest. A19.

In connection with the May Merger Plan, Legacy Sabine and Legacy Forest received a commitment letter from Barclays and Wells Fargo for two loans that would be offered to the Combined Company to ensure its liquidity upon completion of the Combination. The first loan was a new reserve-based lending facility in the amount of $1 billion ("New RBL"), the proceeds of which would be used, in part, to refinance the Legacy Sabine RBL and the Legacy Forest RBL. A19. The lenders also committed to providing $850 million as an unsecured bridge loan ("Bridge Loan") to finance the redemption of the Legacy Forest Unsecured Notes. A19.

However, due to unfavorable market conditions and falling oil prices, the Combination, including the financing, as envisaged by Legacy Forest and Legacy Sabine became untenable. Adding to the Combination's complications, a group of investment firms acquired short positions on the Legacy Forest Unsecured Notes and began purchasing Forest stock in the hopes of defeating the Combination. A20. The financing structure was

amended in July 2014 to extend the lenders' commitment period from November 1, 2014, to December 31, 2014. A20-21. The amended commitment letter included new covenants such as a debt-to-EBITDA ratio covenant for 2014 to 2016 under which the lenders could accelerate all outstanding debt if the Combined Company was in default. A21.

In September 2014, Legacy Sabine's management sought to renegotiate the terms of the Bridge Loan and the New RBL. A22. In November 2014, the New RBL lenders and Legacy Sabine discussed increasing the interest rate on the Bridge Loan in exchange for an increase in the borrowing base of the New RBL, but the proposal was unacceptable because a higher interest rate on the Bridge Loan would worsen the Combined Company's liquidity problems. A23, 208.

In November 2014, David Sambrooks, the CEO of Legacy Sabine, contacted Patrick McDonald, the CEO of Legacy Forest to discuss the Combination's future. Sambrooks suggested that Legacy Sabine and Legacy Forest terminate the Combination. A24, 212-13. Legacy Sabine was concerned that Legacy Forest would sue if Legacy Sabine unilaterally walked away from the transaction. A297.

At a December 2014 meeting of the Legacy Forest Board, McDonald addressed Sambrooks' concerns and the Board concluded that Legacy Forest should forge ahead with the Combination. A24-

25. McDonald advised Sambrooks that the Legacy Forest Board believed it was in the best interests of Legacy Forest to close the Combination. A210. The Legacy Forest Board reviewed the post-Combination company's valuation and consulted with outside financial advisors, including JP Morgan. A209-10, 212, 292. The financial advisors advised Legacy Forest that the stock of the post-Combination company would trade better than Legacy Forest stock, and the Board concluded that the combination was in the best interests of Legacy Forest. A212.

Legacy Forest and Legacy Sabine began exploring alternative structures for the Combination. A26. With the input of legal advisors, Legacy Forest Board member Dod Fraser developed a new structure whereby Legacy Sabine Parent would merge into Legacy Forest. This structure would avoid triggering the change-in-control provisions in the Legacy Forest's Unsecured Notes and thus, obviate the need for the Bridge Loan. A26-27, 215. Legacy Forest shareholders would retain a majority of the common voting power, 60%, to Legacy Sabine's shareholders' 40%. A26. The New RBL lenders were aware of the proposed structure but were instructed to continue parallel negotiations to modify the July Commitment Letter for a structure that would include a Bridge Loan. A27. The New RBL lenders received internal credit approval to finance the alternative proposed combination structure (hereinafter, the "December Merger Plan"). A27-28.

On December 16, 2014, the Legacy Forest Board voted to close under the December Merger Plan. A28. Legacy Forest and Legacy Sabine executed Amendment No. 1 to the July Combination Agreement, formally revising the structure. A215. Under the December Merger Plan, Legacy Forest shareholders would hold 26.5% economic interest and 60% common voting power, with the primary Legacy Sabine shareholder, a First Reserve entity, holding 73.5% economic interest and 40% common voting power. A216. The first step of the Combination was a share exchange whereby Legacy Forest issued shares to Legacy Sabine shareholders in exchange for all the shares in Legacy Sabine. The exchange took place at or around 12:40 p.m. EST on December 16, 2014. A28.

The merger certificates were filed with the New York Secretary of State at 2:09 p.m. EST and the closing of the merger was announced. The Delaware Secretary of State filed the merger certificates at 3:48 p.m. EST. A29. Legacy Forest changed its name to Sabine Oil and Gas Company ("SOGC" or the "Combined Company") after the merger was completed. After the share exchange, all but two Legacy Forest directors resigned and were replaced by former Legacy Sabine directors. The Combined Company's Board consisted of two existing Forest directors and six directors designated by First Reserve and Legacy Sabine. Sambrooks served as the President and Chief Executive Officer.

A324-26. The new Combined Company Board met at 3:30 p.m. to approve the financing. The Combined Company incurred $750 million in the New RBL and proceeded to pay $620 million of Legacy Sabine's RBL and $105 million of Legacy Forest's RBL. A30, 326. The Board also approved an amendment to Legacy Sabine's Second Lien Loan to borrow an addition $50 million, a requirement that the Sabine Subsidiaries secure the New RBL, the additional $50 million on the Second Lien Loan, and the Legacy Forest Notes. A30. The Board also granted liens to secure the New RBL and the additional $50 million borrowed on the Second Lien Loan and the guarantees thereof. Id.

On December 15, 2014, Legacy Forest also closed on a sale of Legacy Forest's Arkoma Assets for approximately $185.1 million. A217. The proceeds of this sale were used to pay down the New RBL to $545 million on December 18, 2016. A218.

C.

In March 2015, SOGC reported in its 2014 year-end annual report that due to a decline in oil and gas prices, the company had substantial liquidity concerns and may be unable to continue as a going concern. Appellees' App. A1397. The Combined Company learned that the holders of the Legacy Forest Unsecured Notes and Legacy Sabine Unsecured Notes might demand that the Combined Company pursue claims against other creditor groups if the Combined Company filed for bankruptcy protection. Id.

On May 15, 2015, the Combined Company's Board approved the
formation of a special committee to conduct an investigation
into potential causes of actions related to the Combination (the
"Independent Directors' Committee"). The Independent Directors'
Committee was comprised of two independent directors, Thomas
Chewning and Jonathan Foster. A31. Neither Chewning nor Foster
were involved in the Combination of Legacy Forest and Legacy
Sabine. A31. With the assistance of legal counsel and financial
advisors, the Independent Directors' Committee concluded that
the only colorable and beneficial claims to assert were claims
to avoid liens on Legacy Forest assets related to the Second
Lien Loan. The Independent Directors' Committee authorized the
filing of an Adversary Complaint against Wilmington Trust, the
Second Lien Loan administrative agent, to avoid liens on Legacy
Forest assets that were pledged to secure Legacy Sabine's
preexisting Second Lien Loan. Appellees' App. A1398; A31-33.

On July 15, 2015, the Combined Company, along with several
subsidiaries, filed a voluntary petition for relief under
Chapter 11 of the Bankruptcy Code. The Official Committee of
Unsecured Creditors of SOGC and affiliated Debtors was appointed
and began an investigation into Constructive Fraudulent Transfer
Claims against the lenders and so-called Bad Acts Claims against
the directors and officers of the Combined Company and of Legacy
Forest and First Reserve. A33. The Bankruptcy Court allowed the

Committee to conduct limited discovery including taking depositions on a limited basis. A33.

On November 17, 2015 and December 15, 2015, the Committee moved for derivative standing to bring certain claims on behalf of the Debtors' estates. A119, 185, 403. The Committee sought to avoid the obligations incurred as a result of the merger and financing as to Legacy Forest, arguing that Legacy Forest had taken on Legacy Sabine's debt without receiving reasonably equivalent value. A123. The Committee also sought to avoid the obligations incurred by the Legacy Sabine Subsidiaries to secure the additional obligations taken on by the Combined Company after the merger. A124. And against a few dozen defendants, including directors and officers of Legacy Forest and Legacy Sabine and First Reserve, the Committee sought to pursue various claims for, among other things, intentional fraudulent conveyance, breach of fiduciary duty, equitable subordination, and recharacterization. A406-07, 408-13.

The Committee was joined by Wilmington and BONY in its motion for STN standing. Several parties objected to the Committee's motion for STN standing: Wells Fargo and Barclays as the administrative agents for the New RBL, the Debtors, First Reserve (the majority shareholder in Legacy Sabine and in SOGC), Wilmington Trust as the administrative agent for the Second Lien Loan, the former directors and officers of Legacy Forest, and

several individual defendants including past directors and officers of Legacy Sabine and current directors and officers of SOGC.

### D.

The Bankruptcy Court held an <u>STN</u> hearing that included live and deposition testimony, spanning 15 days and concluding on March 17, 2016. A34. On March 24, 2016, the Bankruptcy Court issued a bench opinion denying standing to the Committee and the joined parties. The Bankruptcy Court concluded that the first set of claims, the Constructive Fraudulent Transfer Claims as to Legacy Forest, were not colorable. The Bankruptcy Court analyzed the Combination as a whole, concluding that the merger, assumption of Legacy Sabine's liabilities, and incurrence of the New RBL should be analyzed together as a single transaction. A50-51. The Bankruptcy Court reasoned that each step of the Combination was "dependent upon and contingent on each other step and could not have happened on its own." A52.

The Bankruptcy Court also considered the Committee's motion to assert claims on behalf of the Legacy Sabine Subsidiaries and avoid guarantees and liens granted by the Legacy Sabine Subsidiaries on the additional $50 million on the Second Lien Loan and the New RBL in excess of the Legacy Sabine RBL as a result of the Combination. A55. The Court concluded that based on the Committee's calculations the maximum value of the claims

14

was $68 million. The claims were colorable at this early stage
because the Court could not determine whether the Subsidiaries
had received reasonably equivalent value for the guarantees they
had made. A59. The Court also declined to consider whether
Legacy Sabine and the Subsidiaries were members of a single
enterprise such that the benefits received by Legacy Sabine
could be attributed to the Subsidiaries. A59-60. The Bankruptcy
Court determined that although the claims were colorable, it was
not in the best interest of the Debtors' estate to pursue the
claims because the possible recovery was outweighed by the
litigation costs and risk. A95-105. The Bankruptcy Court noted
in particular that "any value 'realized' from avoided liens [by
the Legacy Sabine Subsidiaries] would not be incremental value
brought into the estate but instead would be a reallocation of
value from the New RBL lenders to the unsecured creditors of the
Legacy Sabine Subsidiaries, i.e., to the holders of the Legacy
Sabine Notes." A99.

     With respect to the Bad Acts Claims against several dozen
defendants for intentional fraudulent transfer, breach of
fiduciary duty, aiding and abetting breach of fiduciary duty,
equitable subordination of the New RBL and Second Lien Loan
lenders, and recharacterization of the additional Second Lien
$50 million loan, the Bankruptcy Court concluded that the
Committee's theory of liability was "implausible and the claims

premised upon it are not colorable." A65. Specifically, the
Bankruptcy Court found implausible the Committee's argument that
the December Merger Plan was concocted by First Reserve to
preserve its relationship with the New RBL lenders. A66-70. The
Bankruptcy Court also concluded that the breach of fiduciary
claims against the Legacy Forest directors were not colorable
under New York Law because the Committee failed to plead that
the directors had breached their duty of care. The Legacy Forest
Board had consulted with legal and financial advisors prior to
approving the Combination and the Committee did not rebut the
presumption imposed by the business judgment rule. A79-80. The
Legacy Forest Board was further shielded from liability by an
exculpatory provision in the Legacy Forest certificate of
incorporation. A80.

With respect to the proposed claims against the Combined
Company's Board that met at 3:30 p.m. (the "3:30 Board"), the
Bankruptcy Court concluded that the proposed complaint did not
allege any facts that supported the inference that the 3:30
Board approved the financing with the intent to delay or defraud
creditors. A72-73. The Bankruptcy Court also concluded that the
allegation that the 3:30 Board should have derailed the merger
between the filing of the merger papers in New York and the
filing of the merger papers in Delaware was an implausible
allegation of breach of fiduciary duty. A82-83. The Court also

concluded that First Reserve and the Sabine-Slate members of the Combined Company's Board did not owe a duty of loyalty to Legacy Sabine Subsidiaries. A84-85.

The written decision was dated and filed on March 31, 2016, and the order denying STN standing was dated and filed on March 31, 2016. A112, 115. The Committee, joined by BONY and Wilmington, appealed on April 5, 2016. A564-68. The Appellants presented three issues on appeal: (1) whether the constructive fraudulent transfer claims as to Forest are colorable; (2) whether the "Bad Acts Claims" are colorable; and (3) whether pursuing the constructive fraudulent transfer claim as to the Legacy Sabine Subsidiaries was in the best interests of the Debtors' estates. A582. The Appellees, SOGC, Wells Fargo joined by Barclays, First Reserve, Wilmington Trust, Legacy Forest's directors and officers, individual defendants who were on the Legacy Sabine Board and are now on the SOGC Board, urge this Court to affirm the Bankruptcy Court's denial of STN standing.

## III.

### A.

The Appellants object to how the Bankruptcy Court undertook the STN analysis, arguing that the Bankruptcy Court made unwarranted findings of fact and drew inferences against the Appellants. In determining whether a claim is colorable, the court may properly "engage[] in some review of disputed facts"

17

to determine if there is proper factual support for the allegations, and to determine if the "proposed litigation would be a sensible application of estate resources." In re Adelphia Commc'ns Corp., 330 B.R. 364, 369 (Bankr. S.D.N.Y. 2005). The Court of Appeals has said that a mini trial is not required "[b]ut [the bankruptcy court] should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." STN, 779 F.2d at 905-06. The required showing that any claims be "colorable" is a "relatively easy one to make." Adelphia, 330 B.R. at 376.

In this case, the Bankruptcy Court gave the Committee substantial latitude to present evidence to discharge its burden as to the colorability of the claims and the best interests of the Debtors to pursue the claims. Appellees' App. A3053. The Bankruptcy Court did not err in allowing the Committee to present evidence and the hearing did not violate the STN standard. See In re Smart World Techs., LLC, 423 F.3d 166, 177-79 (2d Cir. 2005) (suggesting that the bankruptcy court should have heard testimony on the viability and merits of the proposed claims before approving a settlement and the showing "was insufficient" even under the usual STN standard). To the extent the Appellants argue that the Bankruptcy Court made credibility

determinations and misapplied the colorability standard, those issues are explored below in the context of the specific claims the Appellants seek to assert against the various potential defendants.

### B.

The gist of the Committee's constructive fraudulent transfer claim as to Legacy Forest was that Legacy Forest did not receive reasonably equivalent value when Legacy Forest assumed Legacy Sabine's debt of $620 million under the Legacy Sabine RBL and $700 million under the Second Lien Loan. The Appellants also argue that because a portion of the $750 million drawn from the New RBL was used to pay down the Legacy Sabine RBL, the New RBL is a voidable constructive fraudulent transfer.[2] A226. The parties affected by the Appellants' proposed claims are Wells Fargo and Barclays, the administrative agents for the New RBL, and Wilmington Trust, the administrative agent for the Second Lien Loan. The Debtors also oppose the Appellants' proposed claims and arguments on appeal.

---

[2] The Committee's proposed complaint alleged that "the Combination and Debt Financing caused Legacy Forest to incur in the aggregate $1.67 billion of obligations, comprised of the New RBL Facility, the Second Lien Loan and the Legacy Sabine Unsecured Notes. . . . All of these obligations are avoidable because Legacy Forest did not receive reasonably equivalent value in exchange for these obligations incurred as part of the Combination." A227. However, at the argument of the current appeal, the Appellants conceded that they did not seek standing to bring claims to avoid the obligations arising from the Legacy Sabine Unsecured Notes. See A123-24 (seeking to avoid "not less than $1.32 billion of obligations").

To establish a constructive fraudulent transfer claim, Section 548(a)(1)(B) of the Bankruptcy Code permits the trustee to avoid a transfer made by the debtor if it can be established "(1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within [two years][3] of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received less than a reasonably equivalent value in exchange for such transfer." In re Actrade Fin. Techs. Ltd., 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005) (internal citation and quotation marks omitted). There is no dispute that the Combination and the financing occurred within the two-year period before the Debtors filed for bankruptcy protection and the parties do not dispute for the purposes of this appeal that Legacy Forest was insolvent at the time of the Combination.

The Appellants argue that Legacy Forest did not receive any value for incurring the New RBL and that the New RBL was used to pay down Legacy Sabine's RBL, which was itself an avoidable obligation. The Appellees argue that the incurrence of the Legacy Sabine RBL and the New RBL were part of a single business

---

[3] The applicable transfer period in § 548 was changed from one year to two years in 2005. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23.

combination which was comprised of several steps—the share exchange, merger, and debt financing transactions— and that the Appellants' argument rests on focusing only on the step where Legacy Sabine's debts were assumed by the Combined Company.

During the STN proceedings, the parties and the Bankruptcy Court focused on the application of the so-called collapsing doctrine whereby a court analyzes a series of transactions to determine if individual steps should be viewed as a single transaction for the purposes of determining whether reasonably equivalent value was given.

> It is well established that multilateral transactions may . . . be "collapsed" and treated as phases of a single transaction . . . [where] one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing.

HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995) (internal quotation marks and citation omitted). This doctrine derives from the principle that courts will look past the form of a transaction to its substance: "an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with its composite implications." Orr v. Kinderhill Corp.,

991 F.2d 31, 35 (2d Cir. 1993) (internal citation and quotation marks omitted).

The Bankruptcy Court applied the collapsing doctrine to determine whether the merger and the incurrence of the New RBL needed to be viewed separately from the rest of the Combination. A49-50. The Bankruptcy Court impliedly rejected the constructive fraudulent transfer claim as to Legacy Forest because it was the Combined Company, SOGC, not Legacy Forest that incurred the obligations. On appeal, the parties do not dispute that the Combination's effect should be analyzed as a whole. See Sabine Debtors' Br. at 12 ("[T]he bankruptcy court correctly applied the collapsing doctrine, holding that the three components of the Business Combination—the Share Exchange, Merger, and Debt Financing—were all integral components of the Combination."); Appellants' Reply at 4 ("Appellants concur with the bankruptcy court that all aspects of the Combination should be collapsed."). Accordingly, all the steps of the Combination are relevant to the constructive fraudulent transfer claim.

The Appellants claim that Legacy Forest did not receive equivalent value in exchange for assuming Legacy Sabine's pre-existing obligations and that the subsequent payment of Legacy Sabine's pre-existing obligations from the New RBL was also a voidable transfer. Under New York law, after a merger, the surviving corporation assumes the obligations and assets of the

22

pre-merger entities. See N.Y. Bus. Corp. L. § 906(b)(3) ("The
surviving or consolidated corporation shall assume and be liable
for all the liabilities, obligations and penalties of each of
the constituent entities."). Although the Appellants argue that
the surviving entity, Legacy Forest now SOGC, assumed Legacy
Sabine's debts, by virtue of the changes to the proposed merger
plan and the decision to close under the December Merger Plan,
"Legacy Forest" was not Legacy Forest as it had previously
existed. The Combined Company or SOGC included whatever assets
and liabilities Legacy Sabine brought with it, including the
$620 million Legacy Sabine RBL. The Appellants do not allege
that the Legacy Sabine RBL or the Second Lien Loan were
fraudulent conveyances when the secured lenders made the
original loans.[4] They do not allege that equivalent consideration
was not given when the debts were originally incurred. Under New
York law, a combination cannot impair these pre-existing
liabilities. N.Y. Bus. Corp. Law § 906(b)(3).

   The Appellants' fraudulent conveyance claim on behalf of
Legacy Forest is an uncomfortable fit with an STN motion. The
claim does not actually seek to retrieve value for the Debtors'

---

[4] The Debtors are pursuing claims against the Second Lien Loan lenders in
connection with SOGC's new liens on assets that had been Legacy Forest
unencumbered assets prior to the Combination. The constructive fraudulent
transfer action seeks to avoid new liens imposed on Legacy Forest's assets
during the Combination. The liens benefited the Second Lien Loan lenders.
Appellees' App. A2063, A2086-87. This alleged constructive fraudulent
transfer represents a new, post-Combination transfer.

estate but seeks simply to rearrange the order of priority among secured creditors and unsecured creditors for part of the assets of SOGC. The Appellants disclaim any argument that the pre-existing Legacy Sabine debts that were assumed by SOGC should be rendered void as constructive fraudulent transfers. Rather, relying on 11 U.S.C. § 548(c), the Appellants argue that the Legacy Sabine lenders would be entitled only to the assets contributed to SOGC by Legacy Sabine and not to any assets contributed by Legacy Forest. They claim that the Legacy Forest assets should be reserved in the first instance for the Legacy Forest creditors. Appellants' Reply Br. at 8. The difficulty with this argument is that § 548(c) is an affirmative defense that applies only if there has been a fraudulent transfer and none has been shown. Moreover, pursuant to § 548(c), the lender has a lien or may enforce an obligation to the extent that the lender gave value to the debtor in exchange for the obligations. There is no question that the Legacy Sabine RBL lenders, the Second Lien Loan lenders, and the New RBL lenders all gave equivalent value for the obligations that they received either before the Combination or after the Combination. Thus, all of those lenders would have the ability to enforce their obligations to the extent of the funds that they provided. Reliance on § 548(c) would thus provide no benefit to the Legacy Forest unsecured creditors or any basis to give the Legacy

Forest unsecured creditors preferential rights to the assets contributed by Legacy Forest to SOGC.

The Appellants cite no case that supports their contention that the Legacy Forest unsecured creditors can use fraudulent conveyance law to obtain post-merger priority access to the former assets of Legacy Forest that were contributed to the Combined Company. The Appellants cite <u>In re Hechinger Investment Company of Delaware</u>, 327 B.R. 537, 552-53 (D. Del. 2005), but that case simply recognized that an acquisition can be a fraudulent conveyance if equivalent value is not given in exchange, and the existence of a subsequent merger did not eliminate the possibility of a fraudulent conveyance, although the Court found that no fraudulent conveyance was shown. The <u>Hechinger</u> claim was markedly different from the claims in this case where the Appellants challenge individual loans all of which were given for equivalent value, and which became the obligation of the Combined Company by virtue of New York merger law, and where the New RBL obligation was incurred for equivalent value provided to the Combined Company.[5]

With respect to the New RBL, the New RBL is an incurrence of a new debt and the new money from the lenders constitutes

---

[5] The Appellants also cite <u>In re Allegheny Health, Education, and Research Foundation</u>, 253 B.R. 157 (Bankr. W.D. Pa. 2000) but that case only stands for the unexceptional proposition that a post-merger entity absorbs the liability of pre-merger entities. <u>Id.</u> at 167.

reasonably equivalent value in exchange for an obligation to pay. 11 U.S.C. § 547(c)(1). Therefore, contrary to the Appellants' argument, it was not a fraudulent conveyance. However, the Appellants argue that because $620 million from the New RBL financed the payment of the Legacy Sabine RBL, the entire New RBL is an avoidable obligation.[6] To reach the conclusion that the New RBL is avoidable, it would be necessary to conclude that the assumption of the Legacy Sabine RBL was also avoidable—a proposition that would be contrary to New York merger law. Moreover, using new money to pay a pre-existing, valid obligation is not a fraudulent conveyance because it does not unfairly diminish the debtor's estate. See HBE, 48 F.3d at 635; 11 U.S.C. § 548(d)(2)(A) (defining value as "satisfaction or securing of a present or antecedent debt of the debtor").

The Appellants point out that "[t]he existence of a fair exchange must be determined from the perspective of creditors rather than from the vantage point of the debtor." Interpool Ltd. v. Patterson, 890 F. Supp. 259, 267 (S.D.N.Y. 1995). "In determining whether a conveyance is fraudulent, [t]he touchstone is the unjust diminution of the estate of the debtor that otherwise would be available to creditors." Id. (internal citation and quotation marks omitted). Prior to the merger, the

---

[6] The Appellants omit the fact SOGC also used the New RBL to pay down another of its existing liabilities—the Legacy Forest RBL.

creditors of Legacy Forest's unsecured notes would have had access to whatever Legacy Forest assets remained after higher-priority creditors were paid. The Appellants contend that as a result of the incurrence of the New RBL and the additional liens placed on Legacy Forest assets to guarantee the Legacy Sabine Second Lien Loan, the recovery on the Forest Unsecured Notes dropped from 60.9% to 36.7%. A55. But the new RBL did not deplete the Debtors' estate because it provided equivalent value for that debt. And the Debtors have already decided to pursue an adversary action that addresses the alleged harm arising from the new liens on Legacy Forest's assets that appear to have impaired the recovery of Legacy Forest's unsecured creditors. A55. The Appellants cannot obtain STN standing to pursue claims that the Debtors are already pursuing because the purpose of STN standing is precisely to allow creditors to pursue claims that a debtor unjustifiably refused to pursue.

The Appellees also argue that there is no colorable claim as to Legacy Forest because the Combined Company, SOGC, received reasonably equivalent value in the Combination and when it assumed the pre-existing Sabine debt. "Whether a transfer is for reasonably equivalent value is largely a question of fact, the determination of which perforce depends on all the circumstances surrounding the transaction." Actrade, 337 B.R. at 803 (internal citation and quotation marks omitted). Although the Bankruptcy

Court did not address the issue of reasonably equivalent value,
the Appellants' STN motion itself concedes that existing
guarantees by the Legacy Sabine Subsidiaries on the Legacy
Sabine RBL and the Second Lien Loan remained in place when the
New RBL was finalized because the New RBL Agreement was not a
novation of the obligations and liabilities under the existing
Sabine Credit Agreement and the Legacy Sabine Subsidiaries
unconditionally guaranteed the payment of the obligations of the
Combined Company under the New RBL agreement. A217-18. Moreover,
the assets of the Legacy Sabine Subsidiaries were valued by the
Appellants' own expert at about $960 million, and exceeded the
amount outstanding on the Legacy Sabine RBL. Appellees' App.
A2359. And as the Appellees point out, Legacy Sabine was in a
position to require the Subsidiaries to pay off or collateralize
the New RBL Debt. Appellees' App A2137 Sec 3.04(c)(ii).

Therefore, the Appellants have failed to show that they
have colorable claims with respect to constructive fraudulent
transfers as to Legacy Forest.

With respect to the Second Lien Loan, the Bankruptcy Court
did not decide whether the claims were colorable because the
Debtors had already filed an adversary proceeding against the
Second Lien Loan lenders for new liens that were imposed on
Legacy Forest's assets. A55. The Debtors do not seek to avoid

the Second Lien Loan;[7] they only seek to avoid the new liens on Legacy Forest assets that were pledged after the Combination to secure the Second Lien Loan. The Second Lien Loan is comprised of a $650 million pre-existing loan for Legacy Sabine and an additional $50 million loan that SOGC borrowed after the Combination. SOGC assumed the Second Lien Loan after the merger. The additional $50 million obligation was in exchange for $50 million in cash. The $50 million obligation constitutes new money in exchange for a new obligation, and cannot be the target of a constructive fraudulent transfer claim. 11 U.S.C. § 547(c)(1). The Appellants briefly argue that the $650 million under the Second Lien Loan is an avoidable obligation, but they do not explain whether they seek to avoid the entire obligation or only the liens securing the obligation. More importantly, they have not shown why they should proceed with claims that the Debtors have already decided to pursue. The Appellants are not entitled to STN standing to pursue claims that the Debtors are already pursuing.

Accordingly, the Bankruptcy Court's decision regarding the Legacy Forest constructive fraudulent transfer claims is affirmed in full.

---

[7] The Second Lien Loan could not be avoided because it is undisputed that the lenders gave equivalent value when they originally made the loan before the Combination.

C.

The Appellants also seek to bring claims on behalf of the Legacy Sabine Subsidiaries to avoid upstream guarantees and liens provided by the Legacy Sabine Subsidiaries in connection with the New RBL and the additional $50 million incurred under the Second Lien Loan in connection with the Combination. A165. The Appellants claimed that the Legacy Sabine Subsidiaries received no value in exchange for $980 million in additional guarantees because the additional sums borrowed were for the benefit of the Combined Company, SOGC, and to pay down its debt. A166. The Bankruptcy Court agreed that there was a colorable claim that the Legacy Sabine Subsidiaries had not received reasonably equivalent value for guaranteeing the New RBL with Legacy Sabine Subsidiaries' assets. A58-60. However, the Bankruptcy Court concluded that pursuing those claims would not be in the best interests of the estate. A105.

On appeal, the parties do not dispute whether the claims on behalf of the Legacy Sabine Subsidiaries are colorable. The Appellants argue that the Bankruptcy Court made fundamental errors of law in assessing the benefits and costs of those claims by underestimating the benefit of bringing the claims and overestimating the costs of the litigation.

A finding of colorability alone is not sufficient to grant derivative standing. Even "[i]f the committee presents a

colorable claim . . ., the court must also examine, on affidavit
and other submission, by evidentiary hearing or otherwise,
whether an action asserting such claim(s) is likely to benefit
the reorganization estate." STN, 779 F.2d at 905.  The
Bankruptcy Court considered evidence that the potential benefit
of pursuing the claims – avoidance of liens would amount to no
more than $68 million for the unsecured creditors of the Legacy
Sabine Subsidiaries, and likely much less. A56. The Bankruptcy
Court concluded that the cost of pursuing the claims would be
about $10 to $15 million, in addition to the lenders' cost of
defending against the litigation. A104-05. The Appellants argue
that the Bankruptcy Court erred because it reasoned that the
recovery would be between $0 and $68 million, and was likely
closer to $0 because only new liens granted post-Combination
could be avoided. See A98. The Appellants also argue that the
Bankruptcy Court should not have considered the lenders'
litigation costs because the lenders have no legal basis to
recover those costs.

On appeal, the Appellants accepted the calculation of $68
million as the potential recovery arising from the claims on
behalf of the Legacy Sabine Subsidiaries. The Appellants take
issue with the Bankruptcy Court's comments that the ultimate
recovery might be closer to zero. Even assuming the Appellants
are correct and they could recover close to $68 million, the

Appellants do not dispute that of the $68 million, a large portion of the potential recovery would have to be shared with the New RBL and Second Lien Loan Lenders because as secured lenders, they have deficiency claims. Appellants' Reply at 22. The Appellants only contend that the *entire* possible recovery should be considered in weighing the costs and benefits of pursuing STN claims.

In assessing the cost-benefit of pursing the derivative claims, it is appropriate to consider the actual amount that would be recovered by the Appellants and that the amount of recovery would be substantially diminished by deducting the amounts due to the secured lenders with deficiency claims. See In re Sunbeam Corp., 284 B.R. 355, 375 (Bankr. S.D.N.Y. 2002) (denying STN standing because any recovery from the proposed claims would be used to pay deficiency claims and would not benefit the parties seeking STN standing); see also In re Adelphia, 544 F.3d at 425-26 (noting that the bankruptcy court did not abuse its discretion in considering, among other things, the fact that the debtor's "equity holders were unlikely to realize any recovery because of the significant sums due to more senior classes"). Accordingly, it is appropriate to discount the possible benefit from the Legacy Sabine Subsidiaries' claim.

With respect to litigation costs, the Appellants argue that the Bankruptcy Court should not have considered the cost of the

lenders defending the litigation. The Bankruptcy Court concluded that the costs of pursuing the claims would be $10 to $15 million, and an "equal amount for the costs of defending such litigation." A105. The Bankruptcy Court based its calculation of the cost of litigating the claims on a percentage of the estimate provided by the Appellants' own expert. Appellees' App. A3070. The Appellants argue that 11 U.S.C. § 506(b) does not provide for reimbursement of the lenders' fees in full and the lenders would only have an unsecured claim for the full reimbursement of their legal expenses. The Appellees point out that the Cash Collateral Order provides for reimbursement of legal fees as part of the lenders' adequate protection claim. See Appellees' App. A2585-86. The Appellants' argument presents an issue of the degree to which the lenders' litigation costs in defending their liens should be considered. At the very least, the lenders have a colorable claim to reimbursement of their fees in defending their liens. The Bankruptcy Court did not abuse its discretion in considering the lenders' defense costs when it weighed the costs and benefits of pursuing the litigation.

Considering the uncertain value of the claims, the complexity of pursuing them, and the defense costs that would be incurred, the Bankruptcy Court did not abuse its discretion in

denying STN standing to pursue Legacy Sabine Subsidiaries'
claims. That denial is therefore affirmed.

### D.

The Committee in its motion for STN standing also sought to
bring claims against several parties that had committed so
called "bad acts": (1) the directors and officers of Legacy
Forest who decided to support the merger although it was
allegedly not in Legacy Forest's interest; (2) the directors of
the Combined Company, some of which were former Legacy Sabine
directors and were affiliated with First Reserve, for allegedly
being conflicted when they approved the financing; (3) the
majority shareholder of SOGC, First Reserve, for undertaking a
financing transaction that was allegedly in its own interest but
not in the interest of the Legacy Sabine Subsidiaries; (4) the
New RBL and Second Lien Loan lenders for allegedly aiding and
abetting the breaches of fiduciary duty by First Reserve. The
Bad Acts Claims included claims for intentional fraudulent
conveyance, breach of fiduciary duty, aiding and abetting breach
of fiduciary duty, equitable subordination, and debt
recharacterization. A405, 477-87. The Bankruptcy Court
thoroughly analyzed the claims and concluded that the
allegations underlying those claims were not plausible and that
the Bad Acts Claims were not colorable.

The Appellants contend that the Bankruptcy Court did not consider the Bad Acts Claims under a proper colorability standard and instead credited the putative defendants' view of the facts and drew inferences against the Committee. Although the Bankruptcy Court referred to the testimony received into evidence during the STN hearing, it is clear that the Bankruptcy Court's decision on the colorability of the claims rested on the implausibility of the allegations in the proposed derivative complaint. See A65.

On appeal, the Appellants do not explain what Bad Acts Claims they are still pursuing. The Appellants mention breach of fiduciary duty claims against the Legacy Forest directors and against the Sabine-Slate Board, also referred to in the Bankruptcy Court's decision as the 3:30 Board. See Appellants' Br. 34-37. The Appellants have not preserved any other claims on appeal. To the extent the Appellants lodge a general objection to the Bankruptcy Court's dismissal of the several dozen Bad Acts Claims, those claims for which the Appellants failed to argue that they have a colorable claim under the governing standards have not been preserved on appeal. Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently

argued in the briefs are considered waived and normally will not be addressed on appeal.").[8]

The gist of the Bad Acts Claims that are preserved on appeal is that (1) the Legacy Forest Board breached its duty of care by failing to terminate the Combination when Mr. Sambrooks approached Legacy Forest about a mutual termination of the Combination and (2) that the 3:30 Board breached its duties to Legacy Forest by approving the financing.[9]

_____

[8] The Appellants only briefly mentioned the equitable subordination and intentional fraudulent conveyance claims, without discussing the applicable legal standard and the allegations supporting those claims. Appellants Br. at 30. The Bankruptcy Court properly concluded that those claims, perhaps also waived on appeal, were not colorable. As to the equitable subordination claim, the Bankruptcy Code gives a court the power to equitably subordinate a claim where the claimant engaged in inequitable conduct and injured other creditors. 11 U.S.C. § 510(c); In re LightSquared Inc., 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014). The allegations supporting the equitable subordination claim in the Committee's STN motion fell far short of pleading that the banks engaged in inequitable conduct. The proposed complaint at most speculates about the banks' "evasive conduct" because it appears that the banks were communicating on the phone and not through email, and is insufficient to show inequitable conduct. See A295-96. The Bankruptcy Court correctly concluded that the facts pleaded in the proposed derivative complaint were implausible and did not state a colorable claim for equitable subordination. A90-91. As to intentional fraudulent conveyance, Section 548(a)(1)(A) of the Bankruptcy Code requires  pleading that a debtor made a transfer or incurred an obligation with "actual intent to hinder, delay, or defraud any entity" to which the debtor was or became indebted. 11 U.S.C. § 548(a)(1)(A). As previously explained, the Committee failed to plead a constructive fraudulent transfer and therefore, could not plead an intentional fraudulent transfer. Moreover, the Committee was required to plead with particularity facts giving rise to a strong inference of actual fraud, and failed to do so. See In re Lyondell Chem. Co., 541 B.R. 172, 181-82 (Bankr. S.D.N.Y. 2015).

[9] It is unclear to what extent the Appellants are pursuing claims against First Reserve on appeal. The Appellants do not mention any substantive claims against First Reserve, such as the claim that First Reserve breached its duties to the Legacy Sabine Subsidiaries and their creditors, A80, or that First Reserve colluded with the New RBL lenders. A73. The Appellants briefly mention the "expansive allegations about First Reserve's conflicted motivations" in the context of their claims against the 3:30 Board. Appellants' Br. at 29. In any event, the notion that First Reserve would push the Combination forward for the benefit of the lenders and at the expense of

The Appellants' primarily argue that the Bankruptcy Court misconstrued New York law concerning the fiduciary duties of directors of an insolvent company. Under New York law, duties are owed not only to the corporation but also to the creditors. These duties are derivative of the duties owed to the corporation.[10] In re I Successor Corp., 321 B.R. 640, 659 (Bankr. S.D.N.Y. 2005) ("Once a corporation becomes insolvent, the fiduciary duties of corporate officers and directors also extend to creditors." (internal citation and quotation marks omitted)).

---

its own equity holdings in the Legacy Sabine Subsidiaries is implausible. See A263-64.

[10] To the extent the Appellants argue they have direct standing to assert breach of fiduciary duty claims, that argument is contradicted by In re I Successor Corp. which expressly states that "claims based on the breach of fiduciary duty to creditors when a company is in the zone of insolvency are *derivative of claims of breach of fiduciary duty to the company itself*." 321 B.R. at 659 (emphasis added). The Appellants are neither a trustee in bankruptcy nor a judgment creditor with standing to assert a direct action for breach of fiduciary duty. See N.Y. Bus. Corp. Law § 720(a)(1)(A)-(B), (b). Moreover, any theories asserting direct claims on behalf of the Appellants are not properly the subject of an STN motion. See In re Blockbuster Inc., No. 10-14997 (BRL), 2011 WL 1042767, at *1 (Bankr. S.D.N.Y. Mar. 17, 2011) ("The only time that a STN review may not be required, the Second Circuit observed, is if an individual creditor is able to show a 'particularized injury' for which a 'direct claim might be . . . available.'" (quoting In re AppliedTheory Corp., 493 F.3d 82, 87 (2d Cir. 2007))). The standing underlying STN and its progeny hinge on the Committee's asserting claims on behalf of the debtor. See In re Adelphia, 544 F.3d at 424. Further, to the extent the Appellants seek to rely on the trust fund doctrine "by virtue of which the officers and directors of an insolvent corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors", the New York Court of Appeals has stated that "[t]he application of the trust fund doctrine in New York customarily has been for the purpose of imposing liability on corporate directors or transferees for wrongful dissipation of assets of an insolvent corporation, in actions later brought by court-appointed receivers, trustees in bankruptcy or judgment creditors." Credit Agricole Indosuez v. Rossiyskiy Kredit Bank, 729 N.E.2d 683, 688 (N.Y. 2000). This case does not present any allegations of dissipation of assets, nor are the Appellants in the position of a trustee in bankruptcy or judgment creditor.

After insolvency, "the officers and directors owe duties to
multiple constituencies whose interests may diverge. At that
point, they have an obligation to the community of interest that
sustained the corporation, to exercise judgment in an informed,
good faith effort to maximize the corporation's long-term wealth
creating capacity." In re Glob. Serv. Grp., LLC, 316 B.R. 451,
460 (Bankr. S.D.N.Y. 2004) (internal quotation marks and
citation omitted).

The Appellants argue that the Bankruptcy Court concluded
that New York law does not impose a fiduciary duty to creditors
on the directors of an insolvent company. This argument is
belied by the Bankruptcy Court's discussion of the "general
duties of care and loyalty imposed on directors of an insolvent
entity, including duties to creditors. Such duties to creditors
. . . are discharged by maximizing the value of the enterprise
for the benefit of all stakeholders." A77. The Bankruptcy
Court's analysis was not "tainted" by what the Appellants refer
to as "errors of law." Appellants' Reply at 17.

The substance of the Appellants' fiduciary duty claim is
that the Legacy Forest Board breached its duty of care when it
approved the Combination. At bottom, the Appellants challenge
the wisdom of the Combination. However, the business judgment
rule creates a presumption that directors of a company act in
good faith and in the best interests of the corporation. Patrick

v. Allen, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005). "The rule is designed to bar[ ] judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." Id. (internal quotation marks and citation omitted). "To overcome the business judgment rule, a complaint must contain specific allegations that the fiduciary acted in bad faith or with fraudulent intent." Glob. Serv., 316 B.R. at 461.

The Appellants contend a breach of the duty of care occurred because the Legacy Forest Board allegedly failed to conduct an insolvency analysis. Lack of due care involves gross negligence by failing to inform oneself of material facts. In re Ampal-Am. Israel Corp., 543 B.R. 464, 475 (Bankr. S.D.N.Y. 2016). The Appellants concede that legal and financial advisors counseled the Legacy Forest Board on the viability of the Combination. A270, 290-94, 360. The financial advisors counseled Legacy Forest that the stock of the post-Combination company would trade better than Legacy Forest stock, and the Legacy Forest Board concluded that the Combination was in the best interests of Legacy Forest. A212. Moreover, the Appellants cite no case law for the proposition that failing to obtain an outside solvency analysis constitutes a breach of the duty of care.

Moreover, even when confronted with possible insolvency, fiduciaries of a corporation are not required to shutter the business and "may, consistent with the business judgment rule, continue to operate the corporation's business. [A] manager's negligent but good faith decision to operate an insolvent business will not subject him to liability for deepening insolvency." In re Eugenia VI Venture Holdings, Ltd. Litig., 649 F. Supp. 2d 105, 126 (S.D.N.Y. 2008), aff'd sub nom. Eugenia VI Venture Holdings, Ltd. v. Glaser, 370 F. App'x 197 (2d Cir. 2010) (internal citations and quotation marks omitted).

 The Appellants also fail to plead any allegations showing that the Legacy Forest Board acted in bad faith or with fraudulent intent. Accordingly, the claim of breach of fiduciary duty against the Legacy Forest directors is not colorable.

The Appellees also persuasively argue that the directors and officers of Legacy Forest are shielded by an exculpatory provision in Legacy Forest's certificate of incorporation. The certificate of incorporation reads that "[a] director of the Corporation shall not be liable to the Corporation or its shareholders for damages for any breach of duty" subject to exceptions for bad faith, intentional misconduct, violation of law, personal gain to which the director is not entitled, or a violation of N.Y. Bus. Corp. Law § 719 relating to certain

prohibited acts by directors. There is no colorable argument
that any of the exceptions was triggered. Appellees' App. A2978.

The Appellants argue that the exculpatory provision is not
effective against direct claims brought under N.Y. Bus. Corp.
Law § 720, ignoring that Section 720 makes any claim against a
director or officer "[s]ubject to any provision of the
certificate of incorporation authorized pursuant to paragraph
(b) of section 402" and Section 402(b) expressly permits the
type of exculpatory provision at issue here. N.Y. Bus. Corp. Law
§ 402(b). Contrary to the Appellants' argument that claims
brought by creditors are not subject to the exculpatory
provision, because an STN motion can assert only *derivative*
claims, the claims the Appellants seek to bring are on behalf of
the Debtors and as such, would be covered by the exculpatory
provision in the certificate of incorporation. Therefore, the
claims against the Legacy Forest directors are also precluded by
the exculpatory provision of the certificate of incorporation.

With respect to the 3:30 Board or Sabine-Slate directors,
the Appellants contend that the Committee sufficiently pleaded
that the Board post-merger was per se conflicted and breached
its duty of loyalty to Legacy Forest by approving the financing.
Under New York law, the duty of loyalty requires a director to
"subordinate his own personal interests to the interests of the
corporation" and prohibits self-dealing. In re Marine Risks, 441

B.R. 181, 200 (Bankr. E.D.N.Y. 2010). "Directors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." Marx v. Akers, 666 N.E.2d 1034, 1042 (N.Y. 1996). According to the undisputed facts, the 3:30 Board met after the Legacy Forest Board approved the merger and after the completion of the share exchange. The Appellants argue that some members of the 3:30 Board were conflicted when they approved the financing because they were associated with First Reserve and because they had previously sat on the Legacy Sabine Board. But there is no allegation that any of the directors on the 3:30 Board sat on both sides of the financing transaction or that the interests of Legacy Forest and Legacy Sabine with respect to the financing were somehow at odds. Accordingly, the alleged conflicts the Appellants point to are implausible. Moreover, the allegation that the 3:30 Board breached its duty of loyalty by approving the financing instead of trying to derail the Combination and developing an alternative structure before the merger papers were filed in Delaware is implausible. See In re Eugenia, 649 F. Supp. 2d at 126. No board could have developed an alternative structure and satisfied its fiduciary duty of care in 18 minutes.

Therefore, because the Bad Acts Claims are implausible, the Bankruptcy Court's decision denying STN standing to pursue the Bad Acts Claims is affirmed.

**IV.**

The secured lenders, Wells Fargo, joined by Barclays, and Wilmington Trust, argue that this appeal should be dismissed as moot. According to the secured lenders, the Cash Collateral Order, entered September 15, 2015, contains admissions with respect to the "First Lien" and "Second Lien" Secured lenders that became binding upon the Debtors and the Committee after the Bankruptcy Court's STN decision. Appellees' App. A2570-73. The Cash Collateral Order provides that an adversary complaint against one of the lenders must be filed by November 10, 2015, and that the filing of an STN motion by the Committee "toll[s] the Challenge Deadline for the Committee or such party in interest, as applicable until five (5) days after the Court, after notice and a hearing, rules on such request." Appellees' App. A2605. Wells Fargo and Wilmington Trust contend that the Challenge Deadline expired on March 29, 2016, and that the releases and admissions in the Cash Collateral Order are now binding on the Debtors and the Appellants.[11]

---

[11] As the Appellants point out, other potential defendants, namely the individual defendants on the Legacy Forest and Legacy Sabine Boards who are the main targets of the Bad Acts Claims, are not sheltered by the Cash Collateral Order. Therefore, the mootness issue is only relevant to the constructive fraudulent conveyance claims against the secured lenders. None

The Bankruptcy Court's STN decision was read into the record on March 24, 2016, and modified by a decision docketed on March 31, 2016. A113. The order denying STN standing was dated and filed March 31, 2016. A115. Therefore, the effective date of the Bankruptcy Court's decision is March 31, 2016. See Fed. R. Bankr. P. 8002(a)(1) (requiring the notice of appeal within 14 days after the "entry" of the order); Muniz v. United States, 236 F.3d 122, 124 (2d Cir. 2001).[12] The Appellants appealed the STN decision to this Court on April 5, 2016, and on the same day, the Appellants sought a stay pending appeal (a) of any action to release denied STN claims and (b) of the expiration of the Challenge Deadline. Supp. App. 239, Doc. 939. On April 21, 2016, the Bankruptcy Court denied the Committee's request for a stay pending appeal and "decline[d] to rule on the Committee's request for a stay of the effectiveness of the STN Order to the extent it would cause the expiration of the Challenge Deadline set forth in the Cash Collateral Order." Supp. App. 244, Doc. 1020 at 14.

---

of the other Appellees, including the Debtors, argued that this appeal was moot.

[12] The Bankruptcy Court also referred to March 31, 2016, as the date of its STN decision. Supp. App. 244, Doc. 1020 at 1. While the Cash Collateral Order states that the Challenge Deadline is tolled until five(5) days after the Court "rules" on the STN motion, there is no basis for interpreting that phrase differently from the date from which an appeal can be taken from an order.

The Appellants argue that the Challenge Deadline was automatically tolled by the request for a stay of the STN order, pointing out that Bankruptcy Local Rule 9006-2 provides for an automatic extension of the time to take an action when a party files a motion for an extension of time until the Court resolves the motion for an extension. Bankr. S.D.N.Y. 9006-2. At the argument of the current appeal, Wells Fargo argued that the Cash Collateral Order does not allow a party to appeal the STN decision. Wells Fargo's current positions concerning the expiration of the Challenge Deadline and the interpretation of the Cash Collateral Order are inconsistent with the position Wells Fargo took before the Bankruptcy Court in opposing the Appellants' request for a stay. Wells Fargo told the Bankruptcy Court that the disposition of *this* appeal would determine whether the Bankruptcy Court would have to consider the issue of the expiration of the Challenge Deadline and urged the Bankruptcy Court to defer consideration of the issue. Supp. App. 248, at 45. That was exactly what the Bankruptcy Court did. At no point did Wells Fargo argue that this appeal was itself moot.

As explained above, the Bankruptcy Court's STN decision is affirmed in all respects. It is therefore unnecessary for this Court to decide whether the terms of the Cash Collateral Order preclude this appeal. Moreover because the Appellants cannot bring any constructive fraudulent conveyance claims, it is

unnecessary for this Court to determine how, if at all, the releases and admissions in the Cash Collateral Order intersect with the claims the Appellants sought to bring.[13] Those issues are subjects for the Bankruptcy Court to decide in the first instance. It is also for the Bankruptcy Court to construe its Cash Collateral Order in the first instance. See In re Casse, 198 F.3d 327, 333 (2d Cir. 1999); 2 Bankruptcy Litigation § 8:5.50.

### CONCLUSION

The Court has considered all the parties' arguments. To the extent not specifically addressed above, the parties' arguments are either moot or without merit. For the foregoing reasons, the Bankruptcy Court's order is affirmed. The Clerk is directed to close all pending motions and to close this case. The Appellants should report to the Court by July 1, 2016, on the status of the related cases, 16-cv-2937 and 16-cv-2949.

**SO ORDERED.**

**Dated:      New York, New York**
**              June 24, 2016**

_____/s/_____

John G. Koeltl
United States District Judge

---

[13] To the extent the parties take issue with the Bankruptcy Court's disposition of the motion for a stay, *that* decision is not part of this appeal and is not subject to this Court's review.